**Min JIN, Plaintiff-Appellant,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant-Appellee.**

**Docket No. 01–7013.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 22, 2001.

Decided: June 27, 2002.

Peter G. Eikenberry, New York, NY, for Plaintiff-Appellant.

Steven E. Obus (Allen I. Fagin, on the brief), Proskauer Rose LLP, New York, NY, for Defendant-Appellee.

(Marcia D. Greenberger; Judith Appelbaum; Washington, DC; Henry A. Petri, Jr.; Brian C. Miller; Howrey, Simon, Arnold &

White; Houston, TX; for Amicus Curiae National Women's Law Center in support of Plaintiff-Appellant.).

(Stephen A. Bokat; Robin S. Conrad; Joshua A. Ulman; National Chamber Litigation Center, Inc.; Washington, DC; Henry A. Rissetto; Jonathan C. Fritts; Morgan, Lewis & Bockius; Washington, DC; Andrew J. Schaffran; Morgan, Lewis & Bockius; New York, NY; for Amicus Curiae Chamber of Commerce of the United States in support of Defendant-Appellee.).

(Hillary Richard; Laurie Edelstein; Brune & Richard LLP; New York, NY; for Amicus Curiae National Employment Lawyers Association/New York in support of Plaintiff-Appellant.).

Before: FEINBERG, OAKES and F.I. PARKER, Circuit Judges.

FEINBERG, Circuit Judge.

Plaintiff Min Jin appeals from a judgment for defendant-appellee Metropolitan Life Insurance Co. (MetLife) in the United States District Court for the Southern District of New York (Eaton, Mag. J.), following a jury trial on Jin's claim that she was sexually harassed by her supervisor at MetLife in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* The district court entered a verdict of "no liability" on the part of MetLife after the jury found, in a special verdict form, that

Jin had been subjected to unlawful sexual harassment by her supervisor, but that the harassment did not result in a "tangible adverse action" affecting the terms or conditions of her employment.[1] On appeal, Jin argues principally that the district court erred in instructing the jury on the definition of tangible employment action.[2] For the reasons stated below, we vacate the judgment of the district court in part, affirm in part and remand for further proceedings consistent with this opinion.

I. Background

A. Procedural History

Jin brought this action against MetLife in June 1995, alleging that she was sexually harassed by Gregory Morabito[3], her supervisor, from May 1993 to June 1994 in violation of Title VII.[4] In March 1998, pursuant to 28 U.S.C. § 636(c), the parties agreed that the case would be heard before Magistrate Judge Douglas F. Eaton. In February 1999, almost three years after the end of discovery, MetLife moved for summary judgment. In July 1999, the magistrate judge (hereafter also referred to as the district court) denied MetLife's motion, holding that "a rational jury could find that Greg Morabito was Min Jin's supervisor[,] that he subjected her to sexual harassment which was sufficiently pervasive to alter the conditions of her employment ... [and] that his harassment culminated in 'tangible employment ac-

---

1. As will be seen below, the district court erroneously used the phrase "tangible adverse action" instead of "tangible employment action" in the jury instructions and verdict form. This issue is discussed in II.A.2.c., *infra*.

2. After oral argument, we requested and received supplemental briefing from the parties and two amici curiae on this issue. In addition, National Employment Lawyers Association/New York moved for leave to file an amicus brief, and that motion was granted.

3. Morabito was originally named as a co-defendant by Jin, but was later dismissed as a party.

4. Jin also asserted a retaliation claim under Title VII and a state claim for unpaid commissions under New York Labor Law § 191-c. The jury found against Jin on the retaliation claim, and the state claim was dismissed during the trial after the magistrate judge ruled that § 191-c applies only to independent contractors.

tion.' " The district court pointed to "evidence that Morabito stuffed [Jin's] commission checks in a drawer starting in January 1994" as a potential tangible employment action.

In November 1999, shortly after retaining new counsel, Jin sought leave under Fed. R. Civ. P. 15 to amend her complaint to add (1) claims of discrimination based on sex, race and national origin and retaliation under 42 U.S.C. § 1981 *et seq.,* New York Executive Law § 290 *et seq.,* and the New York City Administrative Code § 8-107 *et seq.;* and (2) a claim for punitive damages. In December 1999, the district court denied Jin's motion for leave to amend the complaint.

In March 2000, with a trial date less than two months away, MetLife moved to stay the action and to compel arbitration. In April, the district court denied that motion, finding that MetLife had "waived its right to argue for arbitration." MetLife appealed that ruling to this court, and in July 2000 we affirmed the district court's decision. *Jin v. Metropolitan Life Ins. Co.,* 225 F.3d 645 (2d Cir.2000) (unpublished table decision). The trial commenced in September 2000.

## B. The Evidence at Trial

From the evidence presented at trial, the jury could have found the following facts. Starting in 1989, Jin was employed by MetLife as a full-time life insurance sales agent at the company's "Broadway branch" in Manhattan. From 1989-1993, Jin earned over $20,000 in total commissions per year. In her first full year, Jin earned over $48,000 and received a leadership award for her productivity.

Around May 1993, Morabito assumed duties at the Broadway branch, and by at least January 1994, Morabito was acting as Jin's manager and supervisor. From May 1993 to June 1994, Morabito engaged in a pattern of egregious conduct towards Jin that included (a) making numerous crude sexual remarks to her, both in the office and by calling her at home; (b) offensively touching Jin's buttocks, breasts, and legs on numerous occasions at the office, including when she was making sales calls at her desk and walking clients to the elevator; (c) requiring Jin, beginning in the summer of 1993, to attend weekly Thursday night private meetings in his locked office during which he would threaten her with a baseball bat, kiss, lick, bite and fondle her, attempt to undress her, physically force her to unzip his pants and fondle him, push against her with his penis exposed, and ejaculate on her; and (d) repeatedly threatening to fire Jin if she did not accede to his sexual demands, as well as threatening her with physical harm. In February 1994, after months of submitting to the weekly sexual abuse out of fear of losing her job, Jin refused to attend another Thursday evening meeting with Morabito. Jin began working in the evenings and on weekends to avoid Morabito, but he continued to fondle and harass Jin when he saw her. Jin subsequently requested disability benefits due to the effects of the severe harassment. That request was never granted, and Jin was eventually fired by MetLife in October 1995.

At trial, Jin testified that Morabito also punished her for reporting the harassment to other managers in the office by denying her automatic (or direct) paycheck deposit privileges around June 1993, and that, in February 1994, Morabito caused her paychecks to be withheld after she refused to attend any more Thursday evening meetings. However, MetLife presented evidence that Morabito denied the direct deposit of Jin's wages in February 1994 due to her low sales production and that her paychecks were withheld because she

stopped coming to work without being approved for disability leave.

### C. The Jury Instructions and Verdict

Before trial, the district court received proposed jury instructions from both parties. One of the key issues in the charge was the definition of "tangible employment action," which, if found, would subject Met-Life to automatic liability for Morabito's sexually harassing conduct. Jin proposed, among other things, that the withholding of her compensation should be considered a tangible employment action and, in a later written submission to the court, objected to MetLife's assertion that a delay in receiving payment did not constitute such action. During trial, in a pre-charge conference with the magistrate judge, Jin also objected to the court's omission of the withheld checks from its proposed list of tangible employment actions, stating, "She never did get the money.... [S]he was entitled to the paycheck at that time, your Honor. [MetLife] might have been entitled to get some money back ..., but she is entitled to be paid." Jin renewed this objection again when the issue resurfaced after the jury asked the court to clarify the instructions during deliberations.

In her pre-trial written submission, Jin also objected to another of MetLife's proposed instructions

> because it fail[ed] to include as tangible employment action the driving of plaintiff from the workplace by continuous sexual harassment. Mr. Morabito's repeated harassment of plaintiff included such severe and extreme conduct as intimate physical touching and threats of bodily harm, ultimately forcing plaintiff to drastically rearrange her schedule so as to avoid the office during hours Mr. Morabito was likely to be there. Such circumstances constitute action by the supervisor causing a significant change

in plaintiff's employment status under *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761-62, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

And at the pre-charge conference, Jin further argued:

> But if they are driven out of the office by the conduct, I mean, that is a tangible employment action. If they can't come to work anymore because it is too dangerous, that is a tangible employment action....
>
> . . . .
>
> Your Honor, Mr. Morabito is using his authority. He says, you have to come to these Thursday meetings, you have to meet with me in my office. He is using, I am the boss. And if you are going to go into those Thursday meetings, you are sexually harassed and everything else. The supervisor is doing that. Why shouldn't MetLife be responsible for that conduct? That person can't go to work anymore.

The district court ultimately ruled against Jin on the above objections, and instructed the jury as follows:

> A "tangible adverse action" is a significant change in employment status. Minor incidents that cause mere inconvenience and do not alter the actual amount of pay, benefits, duties, or prestige, do not qualify as a "tangible adverse action."
>
> For example, revoking the direct deposit of Ms. Jin's paychecks would not by itself be enough. Holding on to her paychecks while she was out of the office would not by itself be enough. But any of the following could be enough to constitute a tangible adverse action if you find that Mr. Morabito played a role in causing the decision on any of the following:

One, unjustifiably refusing to process policies sold by her, or two, unjustifiably causing her disability claim to be denied, or three, unjustifiably firing her.

It would have to be a situation where Mr. Morabito played a role in causing the decision on the unjustifiable tangible adverse action.

The court gave the jury a "Special Verdict on Liability" form that asked seven questions. The first six were patterned on the Supreme Court's analysis of employer liability in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).[5] The issue of whether there was a tangible employment action, the focus of this appeal, was presented in question four.

On September 27, 2000, the jury unanimously answered the questions as follows:

1. Did plaintiff prove that Mr. Morabito subjected her to unwelcome sexual harassment? Answer: Yes.

2. Did plaintiff prove that Mr. Morabito's conduct was so severe or so pervasive that a reasonable person would find that Ms. Jin's work environment was hostile or abusive? Answer: Yes

3. Did plaintiff prove that Mr. Morabito's conduct was so severe or pervasive that she personally found that her work environment was hostile or abusive? Answer: Yes.

4. Did plaintiff prove that, after January 1, 1994, Mr. Morabito committed an act of sexual harassment that resulted in a tangible adverse action impacting on the terms or conditions of her employment? Answer: No.

5. Did MetLife prove that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior? Answer: Yes.

6. Did MetLife prove that Ms. Jin unreasonably failed to take advantage of any preventive or corrective opportunities provided by MetLife? Answer: Yes.

In answering questions one through three in the affirmative, the jury found that Jin had suffered sex discrimination in violation of Title VII. However, the jury's negative answer to question four made available to MetLife an affirmative defense, discussed below, that shields employers from liability in the absence of tangible employment action. Because the jury found, by answering questions five and six in the affirmative, that MetLife proved that affirmative defense, the district court entered a verdict of "no liability" for MetLife on the sexual harassment claim. Jin appeals the judgment on this claim and the district court's pre-trial order denying her request to amend her complaint.

## II. Discussion
### A. Jury Instructions

We turn first to Jin's claim that the district court erred in instructing the jury on what constitutes tangible employment action. As already indicated, if the jury had found that a tangible employment action resulted from Morabito's harassment, MetLife would have been automatically liable for Morabito's unlawful discrimination regardless of the jury's finding that MetLife proved its affirmative defense.

■■■■ When a proper objection is made below to preserve the issue for our consideration, we review a district court's jury

---

5. The seventh question dealt solely with Jin's retaliation claim, which is not an issue on appeal.

instruction de novo. *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 460 (2d Cir.1999). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994). An erroneous instruction, unless harmless, requires a new trial. *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 100 (2d Cir.1999).

### 1. Legal Principles

Section 2000e-2(a) of Title VII forbids an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex." In *Ellerth* and *Faragher*, the Supreme Court considered the extent of an employer's liability under Title VII for unlawful discrimination caused by the sexually harassing conduct of a supervisory employee.

The Court in *Ellerth* first addressed the significance of the terms "quid pro quo" and "hostile work environment," commonly used to describe types of sexual harassment cases brought under Title VII. The Court found the terms "relevant" when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. 524 U.S. at 753, 118 S.Ct. 2257. In a quid pro quo case, for example, Title VII is violated by explicit discriminatory alterations in the terms or conditions of a plaintiff's employment. Such explicit alterations are established when a plaintiff proves that an action, such as a firing or demotion, resulted from a refusal to submit to a supervisor's sexual demands, *id.* at 753-54, 118 S.Ct. 2257, or that "an employer demanded sexual favors from an employee in return for a job benefit." *Id.*

at 752, 118 S.Ct. 2257. In a hostile work environment case, which involves "offensive conduct in general," *id.* at 753, 118 S.Ct. 2257, the alterations in the terms or conditions of employment are constructive rather than explicit; therefore, the conduct must be severe or pervasive to be actionable. *Id.* at 752, 118 S.Ct. 2257.

■ However, once sex discrimination is assumed (or, as in this case, found by the jury), principles of agency law, and not the labels "quid pro quo" and "hostile work environment," are controlling on the question of an employer's vicarious liability.[6] *Id.* at 754, 118 S.Ct. 2257 ("We turn to principles of agency law, for the term 'employer' is defined under Title VII to include 'agents.') (quoting 42 U.S.C. § 2000e(b)"); see also *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (finding that Congress intended courts "to look to agency principles for guidance" when determining employer liability under Title VII). The Court in *Ellerth* examined several different agency principles that might subject an employer to vicarious liability for an intentional tort committed by a supervisory employee. On the facts before it, the Court focused on one principle in particular: when the supervisory employee "was aided in accomplishing the tort by the existence of the agency relation." *Ellerth*, 524 U.S. at 758, 118 S.Ct. 2257 (quoting Restatement (Second) of Agency § 219(2)(d) (1957)); see also *Faragher*, 524 U.S. at 801-02, 118 S.Ct. 2275 (relying on aided in the agency relation principle).

The Court found that in order to hold an employer liable under this "aided in the agency relation standard," the aid must consist of "something more than the em-

---

**6.** Previously, the standard of employer liability did turn on which type of harassment occurred. See, e.g., *Ellerth*, 524 U.S. at 753, 118 S.Ct. 2257 ("If the plaintiff established a quid pro quo claim ... the employer was subject to vicarious liability.").

ployment relation itself." *Ellerth*, 524 U.S. at 760, 762-63, 118 S.Ct. 2257. Although the Court did not define the exact contours of what the "something more" would have to be, it did identify one class of cases that clearly satisfies the standard: "when a supervisor takes a tangible employment action against the subordinate." *Id.* at 760, 118 S.Ct. 2257. A tangible employment action, as defined by the Court, "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761, 118 S.Ct. 2257.

The Court in *Ellerth* explained why a tangible employment action justifies holding an employer liable for a supervisor's intentional tort of sexual harassment:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. A tangible employment action in most cases inflicts direct economic harm. As a general proposition, only a supervisor, or other person acting with the authority of the company can cause this sort of injury. A co-worker can break a co-worker's arm as easily as a supervisor, and anyone who has regular contact with an employee can inflict psychological injuries by his or her offensive conduct. But one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor....
>
> ....
>
> For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.

*Id.* at 761-62, 118 S.Ct. 2257 (citations omitted).

■ The Court then tackled the question of an employer's liability under the aided in the agency relation standard when a supervisor's harassment does not culminate in a tangible employment action. Balancing numerous concerns, the Court held that in this context an employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 765, 118 S.Ct. 2257. When no tangible employment action is taken, "a defending employer may raise an affirmative defense to liability or damages." *Id.* That defense is comprised of two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* This affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action." *Id.*

### 2. Application

Jin argues that the district court erred in defining tangible employment action for the jury. Specifically, Jin contends that the jury should have been allowed to consider as tangible employment actions: (1) the requirement that she submit to weekly sexual activity with Morabito in order to keep her job; and (2) the withholding of her paychecks. Amicus National Women's Law Center also asserts that the district court committed an additional error by using the term "tangible *adverse* action" instead of "tangible *employment* action" in the jury instructions and verdict form (emphasis added).

■ We agree with Jin that the district court defined tangible employment action

too narrowly. In its instructions, the district court utilized what appeared to be an exclusive list of three economic-based harms to define a tangible employment action: "One, unjustifiably refusing to process policies sold by [Jin], or two, unjustifiably causing her disability claim to be denied, or three, unjustifiably firing her." However, the definition given by the Supreme Court is non-exclusive: "A tangible employment action constitutes a significant change in employment status *such as* hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (emphasis added). By leading the jury to believe it could consider *only* the three enumerated harms, and not the two additional alleged actions discussed in subsections a and b below, the district court improperly narrowed the scope of possible tangible employment actions considered by the jury.

■ We also agree that the district court erroneously instructed the jury that a tangible employment action must be "adverse." The use of the term "adverse" in that manner was contrary to the plain language of both *Faragher* and *Ellerth.*

### a. Morabito's Sexual Abuse

Jin argues that the jury should have been allowed to consider as a tangible employment action Morabito's use of his supervisory authority to require Jin to submit to weekly sexual abuse.

■ As a preliminary matter, MetLife argues that Jin did not object to the jury instructions on this specific ground in the district court and that the restrictive plain error standard of review, which is even narrower in the civil context, should therefore apply. See, e.g., *Jarvis v. Ford Motor Co.,* 283 F.3d 33, 62 (2d Cir.2002) (when insufficient objection made to jury instruc-

tions at civil trial, we may review for fundamental error, which is "so serious and flagrant that it goes to the very integrity of the trial") (citations omitted). Jin contends that she did properly object to the instructions and that de novo review applies.

As discussed in I.C., supra, Jin objected both in writing and at a pre-charge conference to the failure of the jury instructions "to include as tangible employment action the driving of plaintiff from the workplace" by Morabito's regular sexual abuse. Essentially, Jin's position in the district court was that by subjecting her to "severe and extreme" abuse, Morabito caused "a significant change in [her] employment status" by forcing her "to drastically rearrange her schedule so as to avoid the office during hours Mr. Morabito was likely to be there." On appeal, however, Jin principally argues that Morabito significantly changed her employment status by requiring her, under threats of termination, to submit to his weekly abuse. Though the two positions raise similar issues, it is debatable whether Jin "stat[ed] distinctly … the grounds of the objection" that she now argues on appeal, as required by Fed. R. Civ. P. 51.

We will assume therefore, out of a possible excess of caution, that plain error review applies. On this view, we must first determine whether there was error at all. Based on the following analysis, we find that the district court did err by excluding from its examples of tangible employment actions Morabito's explicit conditioning of Jin's continued employment on her submission to his sexual demands.

■ Requiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace. The Supreme Court has labeled

such conduct "appalling" and "especially egregious." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). It is hardly surprising that this type of conduct--a classic quid pro quo for which courts have traditionally held employers liable--fits squarely within the definition of "tangible employment action" that the Supreme Court announced in *Faragher* and *Ellerth*.

Here, Jin presented evidence that Morabito ordered her to submit to demeaning sexual acts, explicitly threatened to fire her if she did not submit, and then allowed her to keep her job after she submitted. Essentially, according to Jin, he used his authority to impose on her the added job requirement that she submit to weekly sexual abuse in order to retain her employment.

The Court's analysis of agency principles in *Ellerth* illuminates why the facts at hand meet the tangible employment action threshold. See 524 U.S. at 761-62, 118 S.Ct. 2257. It was Morabito's empowerment by MetLife as an agent who could make economic decisions affecting employees under his control that enabled him to force Jin to submit to his weekly sexual abuse. Another co-worker could not have so compelled Jin's acquiescence because a mere co-worker lacked the authority to either terminate or retain Jin based on her response to sexual demands. Also, that Morabito as a supervisor could require Jin to report to his private office where he could make his threats and carry on his abuses further supports the claim that his empowerment was as the company's agent.

Moreover, as the Court stated in *Faragher*, employer liability for discriminatory misuse of supervisory authority "is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers." 524 U.S. at 803, 118 S.Ct. 2275.

Employers, for example, have the "opportunity and incentive to screen [supervisors], train them, and monitor their performance." *Id.* This opportunity is certainly crucial when the conduct to be guarded against is the criminal assault of an employee in the employer's own offices.

A 1999 Equal Employment Opportunity Commission (EEOC) Enforcement Guidance (1999 EEOC Guidance), issued specifically to address post-*Faragher/Ellerth* employer liability, provides the following additional analysis:

> If a supervisor undertakes or recommends a tangible job action based on a subordinate's response to unwelcome sexual demands, the employer is liable and cannot raise the affirmative defense. The result is the same whether the employee rejects the demands and is subjected to an adverse tangible employment action or submits to the demands and consequently obtains a tangible job benefit. Such harassment previously would have been characterized as "quid pro quo."

EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors § IV(B), 1999 WL 33305874, at *5 (June 18, 1999). Therefore, under the 1999 EEOC Guidance, MetLife would be automatically liable if Morabito granted Jin a tangible job benefit, such as the retention of her employment, based on her submission to his sexual demands. See also *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir.), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994) (citing *Showalter v. Allison Reed Group, Inc.*, 767 F.Supp. 1205, 1212 (D.R.I. 1991) ("The obvious tangible job benefit the plaintiffs received for succumbing to the harassment was the retention of their employment.")). And as the agency charged with enforcing Title VII, the EEOC's interpretation of the statute "con-

stitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor*, 477 U.S. at 65, 106 S.Ct. 2399 (citations omitted).

 This analysis is consistent with the clear rule of this Circuit prior to *Faragher* and *Ellerth* that an employer is strictly liable when a supervisor "conditions any terms of employment upon the employee's submitting to unwelcome sexual advances." *Karibian*, 14 F.3d at 779. In *Karibian*, the plaintiff alleged that she submitted to a "prolonged, violent, and demeaning sexual relationship" with her supervisor in order to avoid losing her job. *Id.* at 780.. The supervisor had allegedly varied the plaintiff's employment conditions, such as "raises, hours, autonomy and flexibility," based on her responsiveness to his sexual advances and implicitly threatened to fire her if she did not accede. *Id.* at 776. (Here, the alleged threats of termination were *explicit*.) The district court granted summary judgment for the defendant, ruling in part that the employer was not liable under a quid pro quo theory, because the plaintiff had "not suffered any economic detriment." *Id.* at 776.

Reversing and remanding, we held in *Karibian* that to establish a prima facie case of quid pro quo harassment, a plaintiff "must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." *Id.* at 777 (citations omitted). "Because the quid pro quo harasser, by definition, wields the employer's authority to alter the terms and conditions of employment," we stated that an employer is strictly liable for quid pro quo harassment. *Id.* We then held that the district court erred when it required plaintiff to present evidence of actual, rather

than threatened, economic loss. Writing for the court, Judge McLaughlin stated:

> True, in the typical quid pro quo case, the employee who refuses to submit to her supervisor's advances can expect to suffer some job-related reprisal. Accordingly, in such "refusal" cases, evidence of some job-related penalty will often be available to prove quid pro quo harassment. But that is not to say that such evidence is always essential to the claim. In the nature of things, evidence of economic *harm* will not be available to support the claim of the employee who *submits* to the supervisor's demands. The supervisor's conduct is equally unlawful under Title VII whether the employee submits or not. Under the district court's rationale, only the employee who successfully resisted the threat of sexual blackmail could state a *quid pro quo* claim. We do not read Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual encounters. Such a rule would only encourage harassers to increase their persistence.
>
> . . . .
>
> Finally, we believe imposing an "actual economic loss" requirement in a *quid pro quo* case where the employee submits to the unwelcome sexual overtures of her supervisor places undue emphasis on the victim's response to the sexual harassment. The focus should be on the prohibited conduct, not the victim's reaction.

*Id.* at 778-79, 14 F.3d 773 (citations omitted, emphasis in original). Accordingly, we held that the "relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances." *Id.* at 778, 14 F.3d 773. We thus found that the defendant employer would be liable for the alleged conduct, because the supervisor "made and threatened to make decisions

affecting the terms and conditions of [plaintiff's] employment based upon her submission to his sexual advances." *Id.* at 778.

MetLife argues that *Karibian* is no longer good law because the new employer liability framework announced in *Faragher* and *Ellerth*, which focuses on agency principles and the existence of a "tangible employment action," is at odds with *Karibian's* reliance on the "quid pro quo" terminology to impose strict liability on the employer. We disagree. Despite the differences in terminology, *Karibian's* essential holding that an employer is liable in a *submission* case is sound even under the Supreme Court's new liability analysis. When a supervisor "make[s] decisions affecting the terms and conditions of [plaintiff's] employment based upon her submission to his sexual advances," *id.* at 778, he uses his authority to effect, as the definition states, "a significant change in employment status." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257.[7]

MetLife also argues that an employee's acquiescence in a supervisor's sexual abuse under a threat of a tangible employment action (such as termination) is not itself a tangible employment action because the threatened action is never carried out. MetLife points to *Ellerth* for the proposition that an unfulfilled threat is not a tangible employment action, and also relies on our decision in *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000), which held that a constructive discharge (where plaintiff, for example, alleges that she was forced to quit due to a hostile work environment) is not a tangible employment action.

However, neither *Ellerth* nor *Caridad* involved allegations of coerced *submission* to sexual abuse. Plaintiff Ellerth, unlike Jin, was able to resist her supervisor's advances, and the threat to deny her tangible job benefits in lieu of her submission was never carried out. In fact, she was promoted despite the alleged harassment and later quit. See *Ellerth*, 524 U.S. at 748, 118 S.Ct. 2257. And our holding in *Caridad*, where plaintiff quit after complaining of inappropriate physical contact and comments by co-workers and supervisors, flows logically from *Ellerth*, where the Supreme Court held that no tangible employment action was alleged despite Ellerth's claim of constructive discharge. See *Caridad*, 191 F.3d at 291, 294-95.

The key difference in this case is the claim that Jin was required to submit to sexual acts and that Morabito used that submission as a basis for granting her a job benefit (her continued employment). This is substantially different from the type of unfulfilled threat alleged in *Ellerth*, where no job benefit was granted or denied based on the plaintiff's acceptance or rejection of her supervisor's advances. In *Caridad*, we also noted the significant distinction that "[c]o-workers, as well as supervisors, can cause the constructive discharge of an employee." 191 F.3d at 294. But co-workers, unlike supervisors, are not cloaked with the authority to grant or deny job benefits based on another co-worker's submission to their demands.

Indeed, in *Ellerth* the Supreme Court recognized that a submission case is inherently different from a typical unfulfilled

---

7. In fact, the Court in *Faragher* supported this conclusion by noting the "soundness of the results" in and the "continuing vitality" of cases such as *Nichols v. Frank*, 42 F.3d 503 (9th Cir.1994) (holding employer vicariously liable where victim submitted to supervisor's requests for oral sex out of fear that she would lose her job if she refused). 524 U.S. at 791, 118 S.Ct. 2275.

threat case. In ruling that Ellerth had not alleged a tangible employment action, 524 U.S. at 766, 118 S.Ct. 2257, the Court expressly noted that the case *did not* involve a submission scenario. *Id.* at 753, 118 S.Ct. 2257 (question for review was whether a Title VII claim may be stated where plaintiff "has *neither submitted* to the sexual advances of the alleged harasser *nor suffered any tangible effects* on the compensation, terms, conditions or privileges of employment as a consequence of a refusal to submit to those advances") (emphasis added). There was also no submission issue before the Court in *Faragher.*[8]

MetLife further argues that the reaction of the victim to the alleged harassment, whether it be to submit to sexual abuse or to quit employment, does not convert sexually harassing activity into tangible employment action. But our liability analysis focuses on the supervisor's conduct, not the victim's reaction. As we stated in *Karibian,* employer liability results from the *supervisor's* use of the employee's reaction to the *supervisor's* unwelcome sexual conduct "as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." 14 F.3d at 777. Here, Morabito's alleged use of Jin's submission as the basis for allowing her to continue working at MetLife creates the tangible employment action. Even if Jin had not submitted, the analysis would still focus on Morabito's conduct. For example, if he subsequently fired her for resisting him, the termination would constitute a tangible employment action. But if she initially resisted and he did not follow through with his threat of termination,

then that threat would not qualify as a tangible employment action.

Furthermore, although MetLife points out that "a tangible employment action in *most cases* inflicts direct economic *harm,*" *Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257 (emphasis added), there is no requirement that it *must* always do so. Both *Faragher* and *Ellerth* include examples of tangible employment actions that involve economic benefit, such as "hiring" and "promotion," or possibly no economic effect at all, such as "undesirable reassignment" and "reassignment with significantly different responsibilities." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 790, 808, 118 S.Ct. 2275; see also *Meritor,* 477 U.S. at 64, 106 S.Ct. 2399 ("[T]he language of Title VII is not limited to 'economic' or 'tangible' discrimination."); *Durham Life Insurance Co. v. Evans,* 166 F.3d 139, 153 (3d Cir.1999) (economic harm is not the "sine qua non" of a tangible employment action); 1999 EEOC Guidance, 1999 WL 33305874, at *5 (defining tangible employment action to include "hiring," "promotion," "undesirable reassignment," and "work assignment").

As we noted in *Karibian,* many sexual harassment cases do involve some sort of economic harm because they are typically brought by plaintiffs who did not submit to the sexual mistreatment and thereby triggered the threatened economic harm, such as termination or demotion. However, when a victim is coerced into submitting to a supervisor's sexual mistreatment, the threatened detrimental economic tangible employment action may not take place.[9] But that does not mean that use of the submission as the basis for other job deci-

---

8. It is thus understandable that the Court did not include an explicit submission example in its *non-exclusive* list of possible tangible employment actions.

9. Although the alleged tangible employment action here may not have inflicted a direct economic harm, it certainly had an economic impact: in order to retain her income, Jin was required to submit to sexual acts.

sions does not also constitute tangible employment action. Because *Faragher* and *Ellerth* support our earlier holding in *Karibian* that economic harm is not required to hold an employer liable in a submission case, we see no persuasive reason to abandon our prior judgment on that issue.

■ Finally, MetLife relies on a statement in *Ellerth* that a "tangible employment decision requires an official act of the enterprise, a company act." 524 U.S. at 762, 118 S.Ct. 2257. But, assuming Jin's allegations to be true, Morabito's use of his supervisory authority to require Jin's submission was, for Title VII purposes, the act of the employer. This is because Morabito brought "the official power of the enterprise to bear" on Jin by explicitly threatening to fire her if she did not submit and then allowing her to retain her job based on her submission. *Id.*; see also *Faragher*, 524 U.S. at 790, 118 S.Ct. 2275 (citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989) ("When a supervisor requires sexual favors as a quid pro quo for job benefits, the supervisor, by definition, acts as the company")). And though a tangible employment action "in *most* cases is documented in official company records, and *may* be subject to review by higher level supervisors," the Supreme Court did not require such conditions in all cases. *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257 (emphasis added). Indeed, it would be difficult to imagine either documentation or higher level review in a submission case.

■ Thus, under *Faragher* and *Ellerth*, *Karibian's* rule that an employer is automatically liable when a supervisor bases decisions affecting the terms and conditions of a subordinate's employment on the submission to sexual demands remains good law. Because Jin presented evidence that Morabito, as her supervisor, explicitly threatened to terminate her if she did not submit to sexual acts and then allowed her to keep her job after she submitted, the jury should have been instructed to consider the conditioning of her continued employment on her submission as a possible tangible employment action. The district court's failure to include that action in its enumerated list of tangible employment actions in the jury instructions was therefore a prejudicial error. Moreover, because the error was contrary to the relevant rule in *Karibian*, the essence of which is still vital precedent in this Circuit, and in light of the egregious conduct alleged in this case, we are persuaded that this omission was a plain and fundamental error that requires a new trial.[10]

■ In so holding, we reaffirm the view stated in *Karibian* that Title VII should not be read "to punish the victims of sexual harassment who surrender to unwelcome sexual encounters." 14 F.3d at 778; accord *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir.1997). It would be anomalous to find an employer liable when an employee was able to stand up to a supervisor's sexual demands, and therefore provoke an action such as termination, but to find no liability when the employee was unable to refuse and was actually subjected to sexual abuse.[11] Such a rule would

---

10. See also *Jarvis*, 283 F.3d at 62 ("We have found relief from fundamental error to be warranted when the jury charge 'deprived the jury of adequate legal guidance to reach a rational decision.' ") (quoting *Werbungs v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir.1991)).

11. See 1999 EEOC Guidance, 1999 WL 33305874, at *5 ("It would be a perverse result if the employer is foreclosed from raising the affirmative defense if its supervisor denies a tangible job benefit based on an employee's rejection of unwelcome sexual demands, but can raise the defense if its supervisor grants a tangible job benefit based on

punish employees who submit because, for example, they desperately need the income to make house payments, see *Nichols,* 42 F.3d at 507, or because a sick spouse or child depends on their health benefits, see *Showalter,* 767 F.Supp. at 1209. And the employee who is coerced into satisfying a supervisor's sexual demands to keep her job may suffer a greater injury than the employee who is able to refuse those demands. See, e.g., *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 ("[A] requirement that a man or a woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.") (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)) (internal quotation marks omitted). Because we find that *Faragher* and *Ellerth* support our prior holding in *Karibian,* we again decline to condition the standard of employer liability in sexual harassment cases on the victim's ability or inability to refuse a supervisor's demands for sexual acts.

### b. *Withholding of Jin's Paychecks*

■ Jin also argues that the jury should have been allowed to consider the withholding of her paychecks as a tangible employment action. Because Jin properly objected to the jury instructions on this ground below, see I.C., supra, we review the instruction regarding the checks de novo.

The evidence at trial regarding the withheld checks and Morabito's role in the matter included: (a) Jin's testimony that her paychecks were withheld starting in February 1994 and that she never received the withheld checks; (b) the testimony of branch administrator Sandra Lloyd, who was also supervised by Morabito, that starting in February 1994 she held Jin's checks in an office drawer; [12] and (c) Jin's testimony that her first paycheck was withheld the same week she refused for the first time to attend a Thursday evening meeting with Morabito. Jin also testified that Morabito denied her direct deposit privileges in June 1993 as a "punishment", and Doris Mitchell, Jin's coworker, testified that Morabito said he would "fix" Jin by stopping her automatic check deposits. Morabito testified, however, that he canceled the direct deposit of paychecks for five or six account representatives, including Jin, in February 1994 due to their low sales production (to assure that they would report to him weekly, at least to pick up their paychecks). Also contrary to Jin's position was Lloyd's testimony that she withheld Jin's checks without consulting Morabito because Jin was out of the office and her disability status was uncertain.

In the pre-charge conference, the district court stated that it did not think "that the withholding of [Jin's] paychecks on the various special circumstances in this case" would amount to a tangible employment action by itself. Specifically, the district court stated that "the justification given by Ms. Lloyd for holding onto the paycheck[s] was that it was not clear whether [Jin] was on disability," and found that "the evidence suggests that [Jin] just did not really follow through [on her disability application]." The court also noted that "the state of the record seems to be that there was a deduction of [Jin's] training expenses and, depending on whether she was retroactively granted disability, the paychecks per-

submission to such demands. The Commission rejects such an analysis. In both those situations the supervisor undertakes a tangible employment action on a discriminatory basis.").

12. More than 10 checks were so held.

haps were justifiably held." The district court ultimately instructed the jury that the withholding of Jin's paychecks "while she was out of the office would not by itself be enough" to constitute a tangible employment action. The court also refused to include the withholding, at any time, of Jin's paychecks in its enumerated list of possible tangible employment actions. For two reasons, we believe these instructions were erroneous.

First, the withholding of an employee's paycheck due to a supervisor's sexual harassment clearly constitutes a tangible employment action under the Supreme Court's definition. "Dock[ing] another's pay" is a "direct economic harm" that can be inflicted only by a supervisor. *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257. Although there was conflicting evidence presented at trial regarding the reason Jin's checks were withheld, there was circumstantial evidence--namely Jin's testimony that her first check was withheld the same week that she first refused to attend a Thursday night meeting--linking the withholding of the checks to Morabito's harassment. Moreover, Jin's co-worker's testimony that Morabito said he would "fix" Jin by stopping her automatic check deposits could have, in the eyes of the jury, made that link more substantial. And while MetLife presented evidence that Jin's checks were withheld because she was neither working nor on approved disability leave, Jin testified that she *was* working, but at irregular hours so that she could avoid seeing Morabito in the office (thus making the court's instruction about the withholding of Jin's checks "while she was out of the office" confusing). Because Jin's claim regarding the checks was supported "by at least some evidence of probative value," the jury should have been allowed to weigh the evidence and consider the withholding of the checks as a tangible employment action. *Anderson v. Branen*, 17 F.3d 552, 558 (2d Cir.1994).

Second, the lost *use* of wages for a period of time is, by itself, an economic injury that can qualify as a tangible employment action. *Cf. Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir.2001) (employee established adverse employment action for ADA retaliation claim by showing she was suspended without pay for one week, even though she was later reimbursed). Suspending an employee's pay, even temporarily, is an action that can only be authorized by a supervisor, and the loss of an expected steady income can clearly have a serious enough economic impact to change significantly a person's employment status. Jin testified, for example, that she needed her weekly checks to pay rent. Therefore, it is of no consequence that Jin may have owed Met-Life money for training expenses when she was eventually terminated over a year later. She was entitled to the use of her income at the time it was due while she was still employed, and under *Faragher* and *Ellerth*, MetLife would be vicariously liable if Jin was deprived of that use as a result of Morabito's sexual harassment.

Accordingly, we hold that the district court's instructions regarding the withholding of Jin's checks constituted prejudicial error that requires a new trial.

*c. Use of the term "tangible adverse action"*

In its instructions to the jury and special verdict form, the district court used the phrase "tangible adverse action" instead of "tangible employment action." This characterization by the district court contradicts the plain language used in *Faragher* and *Ellerth*. Neither case required a tangible employment action to be adverse, and both cases referred to positive employment decisions, such as "hiring" and "promotion," in discussing such action. *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257; *Faragher*,

524 U.S. at 790, 118 S.Ct. 2275; see also 1999 EEOC Guidance, 1999 WL 33305874, at *5 (stating that Supreme Court did not require tangible employment actions to be adverse). This error is especially significant in the context of this case, where we hold that an employer is liable when a supervisor grants a tangible job *benefit* to an employee based on the employee's submission to sexual demands. The use of the term "tangible adverse action" was therefore a plain and fundamental error that also requires a new trial.

### B. Jin's Motion to Amend Her Complaint

Finally, we turn to Jin's claim that the district court abused its discretion by denying her leave to amend her complaint. Although Jin sought to add several claims through an amended complaint, Jin appeals only the denial of her request to add a claim under the New York City Administrative Code.

We review the denial of leave to amend a complaint under an abuse of discretion standard. See *Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 138 (2d Cir.2000). Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party. See *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Koehler*, 209 F.3d at 138. Outright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion. See *Foman*, 371 U.S. at 182, 83 S.Ct. 227.

In denying Jin's request to amend her complaint, the district court noted that the motion was filed "long after the close of discovery and almost four months after [the ruling] on the summary judgment motion." In fact, Jin's motion for leave to amend came over four years after she filed her original complaint and over three years after the close of discovery. It was therefore reasonable for the district court to find that Jin's late filing constituted undue delay. See *Zahra v. Town of Southold*, 48 F.3d 674, 685-86 (2d Cir.1995) (request to amend complaint was filed two and one-half years after the commencement of the action); *Ansam Associates v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) (discovery had already been completed and non-movant had already filed a motion for summary judgment). Accordingly, we find no abuse of discretion by the district court in denying Jin's request to amend her complaint.

For the reasons stated above, we vacate the order of the district court in part, affirm in part and remand for further proceedings consistent with this opinion.