**HOLLY D., an individual, Plaintiff–Counter–Defendant–Appellant,**

v.

**CALIFORNIA INSTITUTE OF TECHNOLOGY, a California Non–Profit corporation, Defendant–Appellee,**

**Stephen Wiggins, Ph.D., Defendant–Counter–Claimant–Appellee.**

**Holly D., an individual, Plaintiff–Counter–Defendant–Appellee,**

v.

**California Institute of Technology, a California Non–Profit corporation, Defendant–Appellee,**

**Stephen Wiggins, Ph.D., Defendant–Counter–Claimant–Appellant.**

Nos. 01–56050, 01–56189.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2002.

Filed Aug. 15, 2003.

John H. Ernster and Joseph P. Mascovich, Ernster Law Offices, P.C., Pasadena, CA, for the plaintiff-counter-defendant-appellant/appellee.

James A. Zapp, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, CA, for the defendant-appellee.

Diana P. Scott, Greenberg Traurig LLP, Los Angeles, CA, for the defendant-counter-claimant-appellee/appellant.

Before REINHARDT, O'SCANNLAIN, and PAEZ, Circuit Judges.

**OPINION**

REINHARDT, Circuit Judge:

Plaintiff Holly D., a 47–year–old woman, contends that in order to keep her job at

the California Institute of Technology ("Caltech"), she was forced to engage in sexual relations with Stephen Wiggins, the professor for whom she worked. Although she was never told that she would be fired, demoted, or otherwise penalized if she refused, Holly D. asserts that there was an implication that her continued employment depended on her complying with the professor's unwelcome sexual advances. Holly D. alleges that she did, in fact, engage in unwanted sexual acts, and that the sexual liaison continued over more than a year. She now sues both the university and Wiggins for monetary damages, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as well as a variety of claims under state law, including a claim of sexual harassment under California's Fair Employment and Housing Act (FEHA), CAL. GOV'T CODE §§ 12900 *et seq.*

We join the Second Circuit in holding that a plaintiff who contends that she was coerced into performing unwanted sexual acts with her supervisor, by threats that she would be discharged if she failed to comply with his demands, has alleged a tangible employment action under Title VII that, if proved, entitles her to relief against her employer. Here, Holly D. has properly pleaded a claim for relief on a tangible employment action theory; however, she has not presented sufficient evidence on that claim to survive summary judgment. Although we assume that Holly D.'s allegations in this case would also support a claim under the hostile environment prong of Title VII, and that she presents sufficient evidence to establish a prima facie case of such harassment, we hold that Caltech has established, as a matter of law, the affirmative "reasonable care" defense that employers may assert with respect to such charges. We also reiterate that Title VII does not afford monetary relief against a supervisor, such as Professor Wiggins, even when the supervisor is the person who engaged in the underlying wrongful conduct. We therefore affirm the district court's grant of summary judgment in favor of the defendants on Holly D.'s Title VII claims. However, because different and complex issues of state law are presented by the other claims contested on appeal, including Holly D.'s sexual harassment claim under California's FEHA, and because the particular facts and procedural history of the case present unique problems warranting remand, we vacate the district court's orders and judgments with respect to those state law claims, with instructions to the district court to remand them all to the state court for resolution.

## I. BACKGROUND

Plaintiff Holly D., a working mother who suffered from depression as well as from serious financial difficulties, began her employment at Caltech in 1992 as a Senior Administrative Secretary for Professor Theodore Wu. In October 1996, she was promoted to Senior Division Assistant for Professor Stephen Wiggins in Caltech's Control Dynamic Systems department. As with all such transfers in the Caltech system, this move entailed a six-month probationary period, which lasted until April 1997.

Less than a year after Holly D.'s transfer, she and Professor Wiggins allegedly commenced a sexual relationship.[1] Ac-

---

**1.** Although there appears to be little doubt that sexual relations of some sort occurred, the circumstances surrounding the liaison are hotly contested. We make no assessment of the veracity of the parties' allegations. Instead, because Holly D. appeals from an adverse grant of summary judgment, we adopt for purposes of this opinion her version of all

cording to Holly D.: During the probationary period, Wiggins occasionally looked at her buttocks and breasts. Also, he sometimes made sexual comments, including references to his preferences with respect to various forms of sexual activity, and on occasion showed her pornographic websites—although he would eventually cease these activities when Holly D. told him that she was not interested. During the same period, Wiggins criticized Holly D.'s work and threatened to extend her probationary period, perhaps indefinitely. In June 1997, two months after the probationary period ended and one month before the first sexual contact, Holly D. received a performance evaluation that she characterized as negative.[2] In her mind, she drew a connection between her failure to respond positively to Wiggins's sexual comments and his subsequent criticism and negative evaluation. Holly D. eventually decided that, if Wiggins were to request that she engage in sex with him, she would have to comply in order to keep her job.

Holly D. does not contend that Wiggins used physical force to coerce sex, or that he explicitly threatened her with job-related consequences if she did not have sex with him. Nor does she assert that he ever stated, directly or indirectly, that there was a connection between his requests for sex, initial or otherwise, and any problem with her past work performance or her prospects for future employment. Nevertheless, Holly D. relies on what she believes to be indications that her job depended on her sexual submission. She states that, after the sexual relationship had begun, there were periods during which she rebuffed his advances. At those times, she alleges, Wiggins became "supercritical" of her work performance, but she could "neutralize[ ] it by giving in to his sexual demands."[3] Because Holly D. concluded that she could mitigate what she characterized as unreasonable and poten-

---

disputed facts and draw all reasonable inferences in her favor. *See Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.1999).

**2.** Although the overall evaluation was "Good," not one of the eight individually rated criteria was rated higher than "Satisfactory," and half were rated "Fair" or "Unsatisfactory." However, on the evaluation form, Professor Wiggins acknowledged that his expectations were probably unfairly high, and cited Holly D.'s "continued improvement" and her willingness to work hard to meet his expectations.

**3.** In several hundred pages of deposition transcript and lodged declarations, Holly D. provides only three specific examples of Wiggins's allegedly unwarranted criticism. The first two examples, however, occurred well before Wiggins's first request that she participate in sexual acts, and the third example occurred well after the last sexual act took place; Holly D. offered no specific example of unwarranted criticism—or other indication that her job or job status was ·at risk—that was temporally tied to Wiggins's requests for

sex. Nor did she cite any such example that occurred during the periods in which she would decline to have sex with Wiggins.

The first example offered by Holly D. is that during her probationary period, which ended in April 1997, Wiggins unfairly criticized her work and threatened to extend the probationary period indefinitely. Her second example is Wiggins's unenthusiastic June 1997 evaluation, described in note 2, *supra*. These are the only specific acts on which Holly D. relies to support her claim that she was compelled to submit to Wiggins's sexual overtures in order to maintain her employment.

Holly D.'s final proffered indication that her job or job status was at risk is Wiggins's remark upon her return from an absence in April 1999; on this occasion, Wiggins told Holly D. that she was "this close to being on the street." This remark, however, occurred almost one year after the ongoing sexual relationship had ended and several months after the only subsequent sexual act had transpired. Holly D. does not allege that she felt compelled to submit to any request for sex after Wiggins's April 1999 comment.

tially job-threatening criticism by performing sexual acts, she asserts that she is able to establish that she was forced to commence and maintain the sexual relationship in order to keep her employment.

The first sexual contact occurred in July 1997. According to Holly D., Wiggins visited her in her office, where they initially engaged in some discussion about sexual matters. When Wiggins asked what "turned her on," Holly D. replied, "When people talk dirty." Wiggins then asked, "Well, will you suck my dick?" and Holly D. replied "Yes." From July 1997 through July 1998, and then again, following a six-month period of abstinence, on one occasion in January of 1999, Holly D. and Wiggins engaged in various sex acts during work hours in their offices, involving many instances of intercourse and oral sex. In July 1998, after a year of such sexual activities, Holly D. received her second performance evaluation, which she characterized as "excellent." [4]

Between July 1998 and January 1999, no sexual contact occurred, but, as noted, a single final act took place at the end of that period. Holly D. testified that on the day of that last sexual contact, Wiggins came into her office requesting sex at three different times and "wore [her] down." On the third occasion, she said, "All right. Let's get it over with," and performed oral sex on Wiggins. Wishing to maintain evidence of the sexual relations, and having been alerted to practical methods of preserving proof by then—current events in the nation's capital, Holly D. covertly spat some of the seminal fluid from the oral sex onto her coat.

Holly D. first attempted to transfer out of Wiggins's office in July 1998, just about the time that her sexual relations with Wiggins appeared to have come to an end. She applied for another Caltech administrative position at a higher pay rate,[5] but was not hired for that position or the next three positions for which she applied. She suspected that she was not selected because her medical leaves for clinical depression were improperly disclosed to the hiring committee. She complained, but Caltech determined after an investigation that no impropriety had occurred. On October 15, 1998, Holly D. filed an administrative charge with the EEOC, alleging disability discrimination. On May 26, 1999, the EEOC found no cause to proceed on the disability charge, and issued a right-to-sue notice.

Holly D. first mentioned the sexual harassment to a Caltech administration official—specifically, to a Caltech ombudsman in a confidential meeting—shortly after the EEOC found her disability charge to be without merit.[6] She told the ombudsman of the sexual relationship and reported that Wiggins had not requested sex after the one incident in January 1999 until sometime that May, when he "asked for a threesome," which she declined.

On June 15, 1999, Holly D. filed a sexual harassment claim with the EEOC. Holly D. contends that, although she knew that Caltech had a sexual harassment policy,

---

**4.** The overall evaluation was "Very good," and all of the eight individually rated criteria were rated "Good" or "Excellent."

**5.** Holly D. testified that she did not apply for a transfer earlier because, as with her October 1996 job change, she would have been put on probation, and she felt that the less secure status entailed too much risk that she might lose her employment.

**6.** On four occasions, in January, March, April, and May of 1999, Holly D. also mentioned the harassment to therapists who had been treating her for depression. There is no evidence to suggest that any of these therapists was employed by Caltech.

and although she knew she was being harassed, she did not report the harassment to the institution because she felt that it would have been futile, given the administration's "bias[ ] in favor of its faculty." At Holly D.'s request, the EEOC issued a right-to-sue letter without conducting an investigation.

When Caltech was notified, by way of the EEOC letter, of the harassment allegations, a neutral committee was promptly formed to conduct an internal investigation and Holly D. was placed on paid administrative leave to separate her from Wiggins. The committee interviewed Holly D. and Wiggins, and other employees suggested by the accuser and by the accused. Throughout the Caltech investigation, Wiggins denied any sexual contact with Holly D. The investigating committee ultimately found insufficient evidence of sexual harassment. It recommended, however, that Holly D. be transferred to work for a female professor in a different department and location upon her return, and that Wiggins be "reminded" of Caltech's harassment policy.[7]

On August 24, 1999, Holly D. filed suit against Wiggins and Caltech in California state court, alleging sexual harassment in violation of Title VII and California's FEHA. Her complaint also alleged claims under the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, as well as several state law tort causes of action—including sexual assault and battery, and negligent

and intentional infliction of emotional distress—and a breach of contract action.[8]

Caltech removed the case to the District Court for the Central District of California, and then moved for summary judgment, contending that no evidence of any "tangible employment action" had been presented. Caltech also asserted that it qualified, as a matter of law, for the affirmative "reasonable care" defense to vicarious liability under Title VII, which the Supreme Court in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), declared to be available to employers in harassment cases not involving a "tangible employment action." Wiggins also moved for summary judgment. He alleged, inter alia, that no sexual contact had occurred; that, in the alternative, any sexual contact was consensual; and that most of the alleged conduct was barred by the statute of limitations. He also asserted that the "reasonable care" defense was available not only to his employer, but to himself as well.

The district court granted partial summary judgment for Caltech and Wiggins. In its first order, filed on June 26, 2000, the court found that Holly D. had not suffered a "tangible adverse employment action" because "[s]he remained in her position, received salary increases and was not denied any tangible employment benefit." The court also held that, absent a "tangible employment action," the *Faragh-*

7. Holly D. first mentioned her physical proof of sexual relations with Wiggins (the coat with the seminal fluid stains) at her second interview with the Caltech investigation committee, on August 25, 1999. However, she did not permit Caltech to examine or test the coat until after the investigation had been concluded, she had filed the instant action, and a motion to examine the evidence had been lodged.

When the coat was eventually tested, DNA taken from the semen sample matched that of Wiggins. The Caltech Division Chair and Provost thereupon confronted Wiggins, and at the administration's request, he submitted his resignation, which was promptly accepted.

8. Wiggins filed a counterclaim against Holly D. for defamation.

*er/Ellerth* affirmative defense was available to Caltech, and that Caltech had established that defense as a matter of law.[9] In a second summary judgment order filed on November 14, 2000, the district court addressed the remainder of the claims against Caltech. The court held that, under California state law, the *Faragher/Ellerth* affirmative defense was available to Caltech for FEHA claims (as well as for claims under Title VII), and therefore granted Caltech relief on the FEHA claim for the reasons set forth in its earlier order.

As to Wiggins, the district court granted partial summary judgment on most claims through three separate orders. It first granted summary judgment, without explanation, in favor of Wiggins on the Title VII claim. The court then ruled on several policy-laden and unsettled issues of California state law, including the application of a continuing violations theory, the extent to which workers' compensation laws preempt claims for the infliction of emotional distress, and the existence of an affirmative defense to individual liability under FEHA. It did so with little discussion, and in some instances, without referring to any California cases. Finally, although the court in an earlier minute order appeared to have granted summary judgment for Wiggins on Holly D.'s sexual assault claim, it construed her FEHA cause of action to "include" a sexual assault charge, and remanded both that claim and Wiggins' lingering defamation counterclaim to state court for trial. After Wiggins's motion for reconsideration was denied, both Holly D. and Wiggins timely appealed.[10]

## II. DISCUSSION

■ We first address the nature of an employer's liability under Title VII. The Supreme Court set forth the principles governing employer liability for supervisorial harassment of employees in two recent companion cases, *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)[collectively, *Faragher/Ellerth* ].[11] First and most important, the Court determined that the rule governing an employer's Title VII liability must attempt to balance the express Congressional mandate to apply agency law in Title VII cases with Congress's intent to further, through Title VII, other aims of tort law, such as deterrence and the creation of efficient incentives. *See Ellerth*, 524 U.S. at 763–64, 118 S.Ct. 2257. The Court effected this balance by dividing Title VII allegations of harass-

9. The district court also granted summary judgment for Caltech on Holly D.'s federal disability claims and on several state law claims not relevant to our disposition of the sexual conduct complaints. No appeal has been taken from those rulings.

10. As to the district court's grant of summary judgment in favor of Caltech, Holly D. appeals only the disposition of her Title VII, FEHA, and breach of contract claims. As to the district court's grant of summary judgment in favor of Wiggins, Holly D. appeals the disposition of her Title VII and FEHA claims, as well as her claims for sexual assault and battery, and for intentional and negligent infliction of emotional distress. Because the parties are uncertain as to precisely what the district court did, Wiggins also appeals the remand of the FEHA claim, asserting that the reinstatement of the sexual assault charge "included in" Holly D.'s "resurrected" FEHA claim was improper. Wiggins's counterclaim for defamation was remanded to the state court, and this aspect of the district court's remand order was not appealed. All other claims have been abandoned on appeal, and are not encompassed by our instructions to the district court. *See infra* Part III.

11. Caltech does not dispute that Wiggins was Holly D.'s supervisor. We therefore follow the parties in analyzing this case under *Faragher* and *Ellerth*.

ment by supervisors into two categories. Under the Court's approach, when a supervisor exercising his authority to make critical employment decisions on behalf of his employer takes a sufficiently concrete action with respect to an employee, the employer may be held vicariously liable, as in the case of traditional vicarious liability under agency law, *id.* at 760–65, 118 S.Ct. 2257. In all other cases in which a supervisor engages in actions that constitute harassment of an employee, the Court tempered these agency principles by allowing the employer to assert an affirmative defense—the employer may not be held vicariously liable if it is able to establish that it acted reasonably and that its injured employee acted unreasonably.[12] *Id.* The court also adopted a new legal term to describe the first category of claims and to distinguish it from the second: "tangible employment action." Under *Faragher/Ellerth*, when an employee has been subjected to an unlawful "tangible employment action" by a supervisor, the employer may be held liable without more; when the employee has been unlawfully harassed, but there has been no "tangible employment action," the employer may avoid liability by proving the defense of "reasonable care."[13]

**12.** Specifically, the Court held that:
The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
*Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

**13.** It is difficult to find a satisfactory descriptive term for the category of "no-tangible-employment-action" claims. We have chosen the term "hostile environment," even though the class of actionable harassment claims that

## A. Caltech's Liability On A "Tangible Employment Action" Theory

■ The first issue that we must consider is whether Holly D. has alleged the type of discriminatory action by her supervisor for which her employer may be held liable without more—the type of discriminatory action to which the employer may not assert a "reasonable care" defense. There is no question that a "tangible employment action" occurs when a supervisor abuses his authority to act on his employer's behalf by threatening to fire a subordinate if she refuses to participate in sexual acts with him, and then actually fires her when she continues to resist his demands. *See Ellerth*, 524 U.S. at 753–54, 118 S.Ct. 2257. The question in this case is whether a "tangible employment action" occurs when the supervisor threatens the employee with discharge and, in order to avoid the threatened action, the employee complies with the supervisor's demands. We join the Second Circuit—the only other circuit to have directly confronted the issue since *Faragher/Ellerth*—in holding that it does.

### 1. The Legal Standard

The Supreme Court has not yet resolved the question of how the successful coercion of sex by a supervisor who has brought to bear the weight of the business enterprise

do not constitute "tangible employment actions" may not correspond precisely to the class of claims that bore the "hostile environment" label under the pre-*Ellerth* classification scheme. However, we find sufficient overlap to render the familiar phrase useful here. Therefore, we will call Title VII claims that allege a tangible employment action "tangible employment action" claims, and Title VII claims that do not allege such an action "hostile environment" claims. The latter term, indeed, appears to reflect the way the Court itself ultimately described the "no-tangible-employment-action" claim at issue in *Faragher. See Faragher*, 524 U.S. at 808, 118 S.Ct. 2275.

and thereby compelled an unwilling employee to submit to his sexual demands fits into the *Faragher/Ellerth* dichotomy. The Court first addressed the subject generally in *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There, the plaintiff alleged circumstances similar to those alleged by Holly D.: a supervisor requested sexual relations of his subordinate, and "out of what she described as fear of losing her job she eventually agreed," leading to a prolonged period of submission to unwelcome sexual demands. *Id.* at 60, 106 S.Ct. 2399. The Court found that such allegations were sufficient to state a claim for sexual harassment under Title VII, but the Court "decline[d] the parties' invitation to issue a definitive rule on employer liability" for the harassment in question. *Id.* at 72, 106 S.Ct. 2399. Rather, given the state of the record, it remanded the case and directed the lower courts to "look to agency principles for guidance" in developing standards for employer liability under Title VII for a supervisor's conduct. *Id.*

Twelve years later, the *Faragher* and *Ellerth* cases provided a partial answer to the *Meritor* question. In *Faragher,* the plaintiff alleged that she was subjected to repeated "uninvited and offensive touching" and sexual commentary by her supervisors, but she did not contend that she had any reason to believe that she would suffer any adverse employment consequences if she refused to accede to the inappropriate behavior. *See Faragher,* 524 U.S. at 780–82, 118 S.Ct. 2275. In *Ellerth,* the plaintiff's supervisor repeatedly implied that her career advancement depended on her willingness to be more sexually cooperative, but when she ignored his suggestions, she was nevertheless promoted, and suffered no career-inhibiting consequences. *See Ellerth,* 524 U.S. at 748, 751, 754, 118 S.Ct. 2257. In neither case, the Court concluded, did a "tangible employment action" occur. One case in-

volved a threat of material employment-related action that the supervisor failed to implement in any respect, and in the other, no such threat or, indeed, employment action of any kind, transpired; all that occurred was the establishment of a hostile work environment in the traditional pre-*Faragher/Ellerth* sense of the term.

In neither *Faragher* nor *Ellerth* did the Court consider, or comment upon, the question of a supervisor's successful coercion of an employee who submits to her supervisor's sexual demands because of the threat of discharge or other material job-related consequence. Successful coercion, however, depends on the same abuse of supervisorial authority—the power, for example, to hire and fire—that, *Faragher/Ellerth* held, renders a discharge a "tangible employment action." In such cases, the supervisor successfully brings to bear the weight of the employer's enterprise in order to achieve the unlawful purpose. In the typical "tangible employment action" case that reaches the courts, a supervisor has terminated a subordinate who refused to bow to his threats and declined to have sex with him. Because the discharge was possible only as a result of the supervisor's exercise of the authority to make critical employment decisions on behalf of his employer, the Court has held that in such cases the employer may be held vicariously liable and may not assert a "reasonable care" defense. The same rationale holds true in the less frequently litigated cases in which an employee, anxious to retain her position with the employer—a job that is likely to represent her sole means of earning a living—submits to her supervisor's sexual demands because he has advised her of a critical employment decision that he has made: to discharge her if she refuses to comply with his demands. In such cases, unlike in *Ellerth,* the threat does not simply remain unfulfilled or inchoate, but rather results

in a concrete consequence. The supervisor accomplishes the objective of the threat—the coercion of the sexual act—by bringing to bear the authority to make critical employment determinations on behalf of his employer.[14] Specifically, the supervisor in such cases exercises the authority to make the initial conditional decision to discharge, and then to make the subsequent final decision to retain the employee in her position. In doing so, he makes the employee's continued employment contingent on her willingness to accede to his sexual demands.

■ Thus, the participation in unwanted sexual acts becomes a condition of the employee's employment—a critical condition that effects a substantial change in the terms of that employment. "[O]nly a supervisor, or other person acting with the authority of the company," *Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257, can successfully employ this sort of leverage—can effectively make so substantial a change in the employee's fundamental working conditions. Conditioning an employee's continued employment upon submission to sexual demands is not one of those "circumstances where the supervisor's status makes little difference," *id.* at 763, 118 S.Ct. 2257. It directly involves the supervisor's ability to impose upon the employee the ultimate employment penalty—discharge—or to confer on her the ultimate employment benefit—the retention of her job. Thus, determining not to fire an employee who has been threatened with discharge constitutes a "tangible employment action," at least where the reason for the change in the employment decision is that the employee has submitted to coercive sexual demands. *See Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) ("When a supervisor requires sexual favors as *quid pro quo* for job benefits, the supervisor, by definition, acts as the company.") (approved by *Faragher*, 524 U.S. at 790–91, 118 S.Ct. 2275). Accordingly, we hold that in such circumstances, there has been a "tangible employment action" for purposes of Title VII. The employer may be held vicariously liable for the supervisor's unlawful conduct and may not take advantage of the *Faragher/Ellerth* defense.

■ Our pre-*Faragher/Ellerth* cases, although decided before the "tangible employment action" standard was expressed as such, are consistent with this analysis. These cases delineated the bounds of "quid pro quo" harassment—sex for jobs (or job benefits)—which only those acting on behalf of the employer have the capacity to extort.[15] We have long recognized that a supervisor's demand for sexual favors accompanied by a threat of discharge represents archetypical quid pro quo harassment, and in *Nichols v. Frank,* 42 F.3d 503 (9th Cir.1994), we found the employer strictly liable for such harassment when the employee's continued employment was conditioned on her participation in sexual acts. *Id.* at 513–14. Indeed, we recognized that such a case was "clearly at the

---

14. Of course, the supervisor need not be empowered to make the final determination with respect to the ultimate employment decisions. The power to make an effective recommendation is enough. *See, e.g., Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979) (finding respondeat superior applicable whether the supervisor makes or recommends the decision).

15. A complainant establishes a case of quid pro quo sexual harassment by showing that a supervisor "explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct." *Heyne v. Caruso,* 69 F.3d 1475, 1478 (9th Cir.1995) (quoting and adopting *Nichols v. Frank,* 42 F.3d 503, 511 (9th Cir.1994)). Without the authority to act as an agent of the employer, a supervisor has no quid to give.

core" of the harassment requiring respondeat superior liability. *Id.* at 516 (Fernandez, J., concurring).

In *Faragher/Ellerth*, the Supreme Court specifically mentioned *Nichols* when it affirmed the "soundness of the results in these cases (and their continuing vitality)." *Faragher*, 524 U.S. at 791, 118 S.Ct. 2275. The court then clarified, in part, the significance of the circuit courts' quid pro quo jurisprudence by explaining some of the circumstances in which employers would be held liable without the possibility of asserting an affirmative defense. Under the Court's *Faragher/Ellerth* decisions, such unconditional liability attaches only if a quid pro quo threat is implemented by some form of sufficiently concrete employment action. An unfulfilled, or inchoate, quid pro quo threat by a supervisor is not enough;[16] something more is required. Here, as we have explained, the threat is not unfulfilled or inchoate, but is implemented when the supervisor actually coerces sex by abusing the employer's authority, and thus makes concrete the condition of employment he has imposed. In short, the threat culminates in a "tangible employment action."

The *Ellerth* Court offered examples of the sort of supervisory decisions that lead to the imposition of employer liability, without more. These examples provide strong evidence that extorting sexual favors by conditioning continued employment on the performance of sexual acts is properly deemed a "tangible employment action." Among the examples contained in the *Ellerth* Court's illustrative list are actions "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257.

Several aspects of the illustrative list are relevant to our analysis. First, we note that the employer's liability is not dependent on a change having occurred on the organizational chart; next, that the listed acts encompass both typical "actions"— such as hiring and firing—and typical "omissions"—such as failing to promote. We also find no reasoned distinction between the listed occurrences and their opposites. For example, if a supervisor commits a "tangible employment action" by "hiring" a job applicant only because she has agreed to comply with his sexual demands then, surely, such an action must also occur if the supervisor refuses to hire the applicant because she is unwilling to participate in the sexual acts on which he insists. If a supervisor commits a "tangible employment action" by "failing to promote" an employee who refuses to engage in sex with him, such an employment action must also result if he promotes the employee because she submits to his coercive demands. Most significant for this appeal, if a supervisor commits a "tangible employment action" by "firing" an employee because she refuses to enter into a sexual relationship, a "tangible employment action" must also occur when he determines not to fire her because she has performed the sexual acts he demanded.

■ Next, we note that a "tangible employment action" need not cause economic harm to the employee—the *Ellerth* list includes, for example, "reassignment with significantly different responsibilities."

---

16. In such a case, the supervisor may relent and his statement may not result in any tangible action; alternatively, the supervisor's threat may be ignored, or his demand may be rejected, again without further material consequences. In either instance, the Supreme Court has declared that it would be inappropriate on the basis of an unfulfilled threat alone to hold the employer liable without affording it an opportunity to assert a "reasonable care" defense.

*Id.* at 761, 118 S.Ct. 2257. It is true that in the more common "tangible employment action" cases, a supervisor demands sexual favors and, when refused, punishes his victim by an employment action that causes economic harm—the employee is fired or demoted as a consequence of her refusal to have sex with her supervisor. *See Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257. The injury in such cases is clear. When, however, the victim submits to her supervisor's demands and is hired, promoted, not fired, or not demoted *because* she has been successfully coerced into engaging in sexual acts with him, she is also directly injured ·by the employment action. The injury in such cases—the physical and emotional damage resulting from performance of unwanted sexual acts as a condition of employment—is as tangible as an injury can be. *Accord Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 93 (2d Cir.2002).[17]

The element common to each action described in the illustrative *Ellerth* list is that the supervisor has abused his authority to act on the employer's behalf by conditioning an important employment benefit or detriment on an employee's willingness or unwillingness to engage in sexual conduct. When a supervisor hires or promotes an employee *because* she complies with his sexual demands—or when he fires or passes her over for promotion *because* she refuses to comply—he has abused his authority as the employer's agent and has taken a "tangible employment action." The same is true when a supervisor determines that the retention of an employee in the employer's employ will depend on her participation in sexual acts, and then either fires her because she does not participate or retains her in her position because she does.[18]

In an extremely thorough opinion—the only circuit court opinion since *Faragher/Ellerth* to confront the issue directly—the Second Circuit has held that a subordinate's submission to her supervisor's quid pro quo demand for sexual favors constitutes a "tangible employment action." In *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84 (2d Cir.2002), the court found that "[i]t is hardly surprising" that "[r]equiring an employee to engage in unwanted sex

---

**17.** The Second Circuit is the only other circuit to have directly considered, post-*Faragher/Ellerth,* the issue of an employee's submission to a supervisor's sexual demands in exchange for job benefits. *See* discussion at pp. 1171–1175, *infra.* It explicitly rejected a rule that economic injury or a detrimental change in employment status is necessary in order to find a "tangible employment action."

We note that cases in other circuits in which the employment action in question involved a detrimental change—e.g., a discharge—have on occasion referred to *Faragher/Ellerth's* "tangible employment action" requirement by using the term *"adverse* tangible employment action." (emphasis added). No such additional requirement has been alluded to, however, in any case involving sex for job benefits, such as retention of employment. Moreover, we think it clear that coerced compliance with the unwelcome sexual demands of a supervisor constitutes an "adverse" (rather than a beneficial) action.

It is in this light that we must review the isolated references to "tangible adverse employment actions" in two Ninth Circuit cases. *See Nichols v. Azteca Restaurant Enters.,* 256 F.3d 864, 877 (9th Cir.2001); *Montero v. Agco Corp.,* 192 F.3d 856, 861 (9th Cir.1999). Both involved classic detrimental employment actions: a firing, and a constructive discharge. Neither case determined that "tangible employment actions" may not include beneficial employment actions, such as retention of the employee's job, promotion, or (as listed explicitly in *Ellerth* ) hiring. To the extent that the district court concluded otherwise, it erred.

**18.** The fact that the supervisor has actually made such an unlawful decision can be proved either by showing that an employee who refuses to submit to the supervisor's demands has been discharged, or by showing that an employee who submits as a result of the unlawful coercion has been retained in her position.

acts [—] one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace"—"fits squarely within the definition of 'tangible employment action' that the Supreme Court announced in *Faragher* and *Ellerth.*" *Id.* at 94.

*Jin* recognized the propriety of tying its analysis to the supervisor's abuse of authority. *Id.* at 97. The *Jin* court stated that the supervisor in question "used his authority to impose on [his subordinate] the added job requirement that she submit to weekly sexual abuse in order to retain her employment," and that "[i]t was [the supervisor's] empowerment by [the employer] as an agent who could make economic decisions affecting employees under his control that enabled him to force [his subordinate] to submit to his weekly sexual abuse." *Id.* at 94. As the court recognized, when a supervisor abuses this power to control the workplace by conditioning employment on sexual favors, the most relevant factor in apportioning liability is the conduct of the employer's ostensible agent. A contrary rule, allowing the employer's opportunity to avoid liability for its agent's misconduct to depend on an employee's capacity to resist his advances and provoke her own discharge, "would punish employees who submit because, for example, they desperately need the income to make house payments, or because a sick spouse or child depends on their health benefits." *Id.* at 99 (internal citations omitted).

■ The *Jin* court also found persuasive a 1999 EEOC Enforcement Guidance on the topic. "[A]s the agency charged with enforcing Title VII, the EEOC's interpretation of the statute 'constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Id.* at 95 (quoting *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399). Such interpretations are "entitled to re-

spect," *see Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110 n. 6, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal quotation marks omitted), as the *Jin* court implicitly recognized:

A 1999 [EEOC Enforcement Guidance], issued specifically to address post-*Faragher/Ellerth* employer liability, provides the following additional analysis: "If a supervisor undertakes or recommends a tangible job action based on a subordinate's response to unwelcome sexual demands, the employer is liable and cannot raise the affirmative defense. The result is the same whether the employee rejects the demands and is subjected to an adverse tangible employment action or submits to the demands and consequently obtains a tangible job benefit. Such harassment previously would have been characterized as 'quid pro quo.'" *Therefore, under the 1999 EEOC Guidance, [the employer] would be automatically liable if [the supervisor] granted [the employee] a tangible job benefit, such as the retention of her employment, based on her submission to his sexual demands.*

*Jin,* 310 F.3d at 94–95 (emphasis added) (internal citation omitted); *see also* EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, § IV.B, No. 915.002 (June 18, 1999)[hereinafter 1999 EEOC Guidance]; *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 267–68 (4th Cir.2001) (noting that a tangible employment action may occur when harassing supervisors bestow benefits in exchange for an employee's acquiescence).

The Third Circuit, after carefully analyzing *Faragher/Ellerth,* explicitly endorsed *Jin's* reasoning, as well as its holding. In *Suders v. Easton,* 325 F.3d 432 (3d Cir. 2003), the court wrote:

[C]ourts have explicitly recognized that some of the most pernicious forms of

workplace harassment, clearly amounting to *tangible employment actions,* are often not accompanied by official company acts. This is especially true in *quid pro quo* cases where a victimized employee submits to a supervisor's demands for sexual favors *in return for job benefits, such as continued employment.* ... [I]t is rare that a supervisor's demands for sexual liberties, and the corresponding threat of adverse consequences for failure to submit, will be documented anywhere in company records. Therefore, a rule requiring a victimized employee who submits to a supervisor's indecent demand for sexual favors to prove an official company act in order to establish a tangible employment action strains common sense. As the Second Circuit has held, the more sensible approach in the *quid pro quo* context is to recognize that, by his or her actions, a supervisor invokes the official authority of the enterprise[.]

*Id.* at 458–59 (emphasis added).

Like the Third Circuit, we fully agree with *Jin.* We join the Second Circuit in holding that, in addition to those acts explicitly mentioned in *Ellerth,* a "tangible employment action" occurs when a supervisor extorts sexual favors from an employee by conditioning her continued employment on her participation in unwelcome sexual acts. Thus, a *Faragher/Ellerth* affirmative defense is not available to the employer, whether the supervisor who abuses his supervisorial authority succeeds in coercing an employee to engage in sexual acts by threats of discharge, or fails in his efforts to coerce the employee and then actually discharges her on account of her refusal to submit to his demands. Either way, the abuse of supervisorial authority results in a "tangible employment action" that causes significant injury to the employee involved.

### 2. The Evidence Presented

Here, although Holly D. has properly alleged a "tangible employment action," we conclude that, in response to the motions for summary judgment, she failed to present sufficient evidence to raise a genuine issue of material fact as to whether Wiggins implicitly threatened to discharge her or conditioned her continued employment on her submission to his sexual demands.

### a. Implied Conditions

█ We first note that Holly D. need not prove that Wiggins explicitly demanded sex in return for job security—the factual circumstances present in *Jin*—in order to prevail on a "tangible employment action" claim. *Cf. Jin,* 310 F.3d at 89, 95. Such a claim may lie either when continued employment has been expressly conditioned on participation in sexual acts or when the supervisor's words or conduct would communicate to a reasonable woman in the employee's position that such participation is a condition of employment. *See, e.g., Heyne,* 69 F.3d at 1478 (finding liability for either explicit or implicit demands); *Nichols,* 42 F.3d at 511 (same). A practitioner's guide surveying the law of several circuits correctly explains:

> It is enough that the individual making the unwelcome sexual advance was plaintiff's supervisor, and that a link to employment benefits could [reasonably] be inferred under the circumstances.

MING W. CHIN ET AL., CAL. PRACTICE GUIDE EMPLOYMENT LITIG. ¶ 10:51 (2002).

Nor must Holly D. prove that Wiggins intended that her continued employment would actually be contingent on her compliance with his requests—that is, she need not offer proof of his subjective intent to fire or demote her if she did not comply. Rather, it would be sufficient to show that a reasonable person in Holly

D.'s position would have believed that her job depended on fulfilling Wiggins's demands.[19] *See Nichols,* 42 F.3d at 511–12; *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995); *Ellison v. Brady,* 924 F.2d 872, 878–80 (9th Cir.1991).

 However, we reiterate that the most

> difficult factual and legal questions will almost always arise whenever either the conditioning of benefits (or absence of detriment) or the request for favors is not explicit, but is instead *implicit* in the harasser's communications or dealings with his prey. ... Harassment in cases of implicit conditioning can be inferred only from the particular facts and circumstances of the case. We must examine each such charge with the utmost care, for an error either way can result in a gross injustice and will often have a disastrous impact on the life of whichever person is truly the injured party.

*Nichols,* 42 F.3d at 512 (opinion of Reinhardt, J.). In some cases, an injustice can result simply from allowing an unmeritorious case to proceed to trial; in others, it may result from the denial of a fair hearing to a legitimate victim of sexual harassment. Either way, in cases alleging that an employee engaged in sexual relations because her supervisor implicitly demanded that she do so as a condition of her employment, we require more than conclusory allegations that the supervisor proposed a sexual liaison and the employee responded to the overtures in order to protect her employment interests.

Given the amount of time Americans spend at work and the degree to which women have been absorbed at every level into a workforce that was once largely all-male, it is especially important to scrutinize carefully the facts and circumstances of each case. It is not easy, let alone desirable, to attempt to regulate sexual attractions among persons working together or to proscribe romances that may develop and even flourish in the workplace. Some of these relationships will, if nature is allowed to take its course, develop between persons at different levels in the hierarchy, just as hierarchical boundaries have failed to contain romance throughout history. *See, e.g.,* Glenn Frankel, *Mrs. Simpson's Other Man; Britain Opens Files on Royal Intrigue of 1930s,* WASH. POST, Jan. 30, 2003, at A1 (describing the romance of Mrs. Wallis Simpson and Edward VIII, the Prince of Wales). The workplace is not and should not be a sterile or barren space, and it is not the job of the legislature or the courts to make it so. However, not all attempts at courtship or coupling are legitimate, and all three branches of government have emphatically declared that it *is* our role to enjoin and remedy predatory workplace conduct so that all workers may earn a living with dignity, free from sexual harassment or abuse. Given the imbalance of power, persistent unwanted sexual attention from a supervisor has the potential to result in significant harm. A supervisor may find love or companionship with one he oversees, but he may not use his

---

19. Holly D. did not raise the question of the legal effect of her financial and psychological circumstances as an issue on appeal; nor did she argue that a different standard of "reasonableness" should be applied to her than to the average woman who held the type of job she held. Finally, she did not present argument or evidence as to what any different standard should be in the case of women in financial or psychological difficulty.

Under these circumstances, we do not address the issue of whether the supervisor's conduct as alleged here could constitute a tangible employment action in the case of a woman who alleges that her responses must be viewed not from the standpoint of an average reasonable woman but from that of a reasonable woman suffering from serious financial and emotional disabilities. We reserve that issue for an appropriate case.

position to extort sexual favors from an unwilling employee. In the end, given all of the intangibles involved in the development of relationships between human beings, we proceed with particular caution when examining claims of sexual harassment based on implicit rather than explicit threats to condition employment benefits or detriments on an employee's participation in sexual acts.

### b. Holly D.'s Evidence

After the most careful examination, we conclude that in this case Holly D. has not presented sufficient evidence to raise a genuine issue of material fact with respect to whether Wiggins conditioned her continued employment, implicitly or otherwise, on her having sex with him. While the question is admittedly close, our answer is dictated by the record made below.

▮ We recognize that "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside,* 204 F.3d 947, 959 (9th Cir.2000) (citations omitted). Nevertheless, after considering all of the sworn declarations, lodged depositions, authenticated documents, and undisputed admissions, and after drawing all reasonable inferences in Holly D.'s favor, we conclude that a reasonable woman in Holly D.'s position would not have had cause to believe that she would be fired or that she would suffer any other tangible employment consequences if she declined to have sex with Wiggins.

Holly D. knew that Wiggins was a demanding and at times arbitrary supervisor, and that he had given her an initial evalua-

tion that was not encouraging. She also knew that Wiggins was prone to making statements concerning sex, to commenting on his own sexual proclivities, and to demonstrating his familiarity with pornographic websites. Sometimes, he "pressed on," even when she expressed no interest in the subject, although she also knew that he would stop the discussions when she made it clear that she wanted him to.

Even assuming, without deciding, that Wiggins created an uncomfortably sexualized environment and that he was a difficult and demanding boss, the evidence in this case does not permit the inference that his conduct, implicit or explicit, would have caused a reasonable woman in Holly D.'s position to believe that her continued employment was dependent upon her providing him with sexual favors, or that there would be no point in declining his first invitation to engage in sex. Holly D. has produced no evidence whatsoever *connecting* any discussion of her job duties with Wiggins's requests that she engage in sexual acts with him. Nor is there any evidence that Wiggins ever mentioned any potential change in her employment status, or indeed any job-related matters or problems, during any discussion regarding her participation in sexual acts with him, or while actually engaged in such acts. *See Nichols,* 42 F.3d at 512–13 (opinion of Reinhardt, J.) (noting that a "verbal nexus" between work-related discussions and sexual requests, although not necessary to a finding of an actionable quid pro quo offer, often helps to establish the existence of an implicit condition). Indeed, the first time that Wiggins asked Holly D. to engage in a sexual act—to which request she replied simply and directly, "Yes"—he did so in a discussion in which the record reveals no mention of any subject other than sex.[20]

---

**20.** Holly D. testified that the first sexual act, in July 1997, ensued as follows:

He was asking what turns me on. And so I said: When people talk dirty.

The mere fact that Holly D. received a less than enthusiastic initial job evaluation weeks earlier does not, without more, support her contention that her compliance with Wiggins's initial request for sex was necessary to save her job. Moreover, other than her vague and unsupported allegation that during the course of their one-and-a-half-year sexual relationship, Wiggins grew "supercritical" when she rejected his advances, Holly D. has presented no evidence that would cause a reasonable woman in her position to believe that Wiggins suggested, directly or indirectly, the existence of a connection between her job security and his requests for sex. Holly D.'s unsubstantiated assertions describing Wiggins's behavior in so vague and general a manner are not sufficient to overcome the motion for summary judgment. *See* note 3, *supra; see also FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir.1997).

*On this record,* drawing all inferences and resolving all disputed facts in her favor, Holly D. has not presented sufficient evidence to allow a jury to find that a reasonable woman in her position would have believed that, in order to keep her job, she was required to accept Wiggins's initial invitation to engage in sex or thereafter to continue the sexual liaison over a one-and-a-half-year period. The mere fact that Wiggins was interested in sex generally and desired to have sex with Holly D. is simply not enough.[21] Because on this record insufficient evidence suggests that

Wiggins explicitly or implicitly demanded sexual favors from Holly D. in return for job security or other benefits, we hold that the district court did not err in ordering summary judgment for Caltech on Holly D.'s "tangible employment action" claim.

## B. Caltech's Liability On A Hostile Environment Theory

 Even if no "tangible employment action" has been proven, a plaintiff may still recover for severe or pervasive sexual harassment that results in a hostile work environment; unlike in "tangible employment action" cases, however, the employer has the opportunity to avoid liability for such claims by establishing the elements of the "reasonable care" affirmative defense described in *Faragher/Ellerth. Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. In the present case, we assume without deciding that, for purposes of summary judgment, Holly D. has established a prima facie case of hostile environment harassment by offering evidence regarding Wiggins's frequent and persistent efforts to force unwelcome sexual commentary and materials upon her, including the display of pornographic computer images and regular explanations of his sexual interests and activities, despite her communicated lack of interest in the subject. Nevertheless, we affirm the district court's grant of summary judgment in favor of Caltech on the hostile environ-

---

And that's when he said: Well, will you suck my dick?

And he was standing—I can remember he was standing there with his crotch in my face. I said "yes." Then he pulled out his penis and I gave him oral sex.

That's how everything started, that I can recall.

21. We recognize, of course, that the supervisory nature of the employment relationship between Wiggins and Holly D. must be con-

sidered when determining whether a reasonable woman in Holly D.'s position would have believed that her continued employment was contingent on engaging in sexual acts with her supervisor. However, on this record, even in light of the supervisory authority Wiggins exercised over Holly D., Holly D. has failed to make a sufficient showing, for summary judgment purposes, that a reasonable woman in her position would have so interpreted Wiggins's actions.

ment claim because Caltech has established both parts of the "reasonable care" defense.

▪▪▪ To prevail on the affirmative defense of "reasonable care," an employer must prove "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by [it] or to avoid harm otherwise." *Id.* Holly D. contends that she has raised a genuine issue of material fact as to the reasonableness of Caltech's preventive and corrective measures and of her decision to forego those procedures. We disagree on both counts.

### 1. Caltech's Reasonable Efforts to Prevent and Correct Harassment

Holly D. first asserts that Caltech did not take reasonable care in the design of its anti-harassment policy. To support this contention, she offers the expert opinion of Professor Brian Kleiner, whose declaration states that he would testify at trial that an effective sexual harassment program could reasonably include each of six components not offered by Caltech—such as peer review of supervisors and mandatory sexual harassment training for employees. Professor Kleiner also states that he would testify that an employer could reasonably communicate a sexual harassment policy by each of nine means not employed by Caltech, including role-playing sessions and training videos.

▪▪▪ The legal standard for evaluating an employer's efforts to prevent and correct harassment, however, is not whether any additional steps or measures would have been reasonable if employed, but

whether the employer's actions as a whole established a reasonable mechanism for prevention and correction. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Caltech had promulgated a written policy which defined prohibited behavior, identified contact personnel, and established procedures to investigate and resolve any claims. It made this policy available in several publications, at least one of which Holly D. received in 1996, when she began working with Professor Wiggins. Caltech also conducted periodic training on sexual harassment, which it publicized to staff and faculty by email, including at least one email sent in 1998 during the period when Holly D. was allegedly being harassed. Holly D. testified that she knew about this training, and indeed, that she knew that Wiggins's behavior constituted sexual harassment. On this record, Professor Kleiner's expert testimony does not sufficiently undermine Caltech's written anti-harassment policy, which on its face is reasonable.

Holly D. next contends that even if Caltech's policy was facially reasonable, it was unreasonably implemented, and that Caltech failed promptly to correct harassment when it occurred. She charges, for example, that Caltech gave unfair deference to its faculty such that no administrative employee could expect to prevail on a harassment charge. However, she has offered absolutely no evidence to support this allegation.[22] When Caltech learned about Holly D.'s allegations for the first time in June 1999 as the result of her filing a claim with the EEOC, it promptly convened an investigatory committee, which impartially interviewed every witness suggested by either Holly D. or Wiggins. At first, the investigatory committee found insufficient evidence of harassment, but

---

**22.** Holly D. notes her dissatisfaction with Caltech's resolution of her own disability discrimination claim, but the deficiencies complained of fall far short of establishing an inference that the administration was so faculty-biased that its sexual harassment investigations were ineffective.

nevertheless recommended that Holly D. be transferred to work for a female professor in a different department and location and that Wiggins be "reminded" of Caltech's harassment policy. Moreover, although post complaint conduct will not exonerate a party at fault, we note that once Caltech gained access to the physical evidence belying Wiggins's assertion that no sexual contact had occurred—evidence that Holly D. declined to provide to the investigating committee—Wiggins was immediately asked for his resignation and promptly resigned.

Professor Kleiner attacks these efforts as "seriously flawed," by contending that during its initial investigation, Caltech should have interviewed Professor Wiggins's former secretary, inspected Professor Wiggins's computer for bookmarks to pornographic websites, and examined Professor Wiggins's "intimate areas" to corroborate Holly D.'s alleged knowledge of his anatomy.[23] Even were we to assume that all of these additional steps were advisable, Caltech's failure to pursue all possible leads does not undermine the substantial showing in this case that its investigation was, in toto, both prompt and reasonable. On the evidence presented, therefore, we find that Holly D. has raised no genuine issue of material fact as to whether Caltech exercised reasonable care to prevent and correct sexual harassment.

2. Holly D.'s Unreasonable Failure to Take Advantage of Opportunities to Avoid Harm

■ To prove its affirmative defense, Caltech must prove *both* that its efforts to provide relief were reasonable and that

Holly D.'s decision to forego the available avenues of relief was unreasonable. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; 1999 EEOC Guidance at § V.B. This second prong of the defense is intended to fulfill a "policy imported from the general theory of damages, that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute." *Faragher*, 524 U.S. at 806, 118 S.Ct. 2275 (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 n. 15, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982)). "And while proof that an employee failed to fulfill the ... obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* at 807–08, 118 S.Ct. 2275.

■ Here, it is undisputed that Holly D. sought no relief of any kind from Caltech until June 1999, after a full year of unwelcome sexual activity and almost two years after the first sexual incident. Holly D. explains her hesitation by asserting that she did not feel comfortable pursuing assistance from Caltech's employee relations department because she "went to them on two occasions and [she] was unsatisfied with how they handled" her disability discrimination complaint. Even if Holly D.'s hesitation to engage the employee relations department were reasonable—and we do not believe that it was—she has offered no evidence to explain why she did not seek help through any of the other sources affiliated with Caltech. The Divi-

---

**23.** Professor Kleiner further suggests that Caltech did not in its investigation properly analyze the parties' motivation to lie. There is no evidence, however, that his expertise in human resource management encompasses a determination of the proper credibility or weight to be given to the statements of individual witnesses in a harassment investigation.

sion Administrator, Division Chair, Provost, Dean, Staff and Faculty Consultation Center, Counseling Center, and Women's Center at Caltech were all specifically identified by Caltech's written policy materials as equipped to offer assistance in cases of sexual harassment, but Holly D. made no attempt to seek relief from any person able to help put a stop to the harassment. Under similar circumstances, we have found a complete failure to use available and adequate procedures to be unreasonable. *See Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1181–82 (9th Cir. 2001); *Montero v. Agco Corp.*, 192 F.3d 856, 863 (9th Cir.1999). Holly D. has presented no evidence to indicate that a different conclusion would be appropriate here.[24]

Because Holly D. has not presented evidence sufficient to raise a genuine issue of material fact either on her "tangible employment action" claim or on Caltech's affirmative defense to her hostile environment claim, we affirm the district court's grant of summary judgment to Caltech on her Title VII claim.

## C. Wiggins's Individual Liability Under Title VII

█ In its order of June 26, 2000, without explanation, the district court granted

summary judgment on Holly D.'s Title VII claim in favor of Wiggins. We also affirm the district court's disposition of this claim. We have consistently held that Title VII does not provide a cause of action for damages against supervisors or fellow employees. *See Pink v. Modoc Indian Health Project*, 157 F.3d 1185, 1189 (9th Cir.1998); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587–88 (9th Cir.1993).

## D. The State Law Claims

The Title VII claims addressed *supra* were the only federal claims before the district court that are raised on appeal.[25] However, in a series of confusing orders granting summary judgment for the defendants with respect to most of the remaining state law claims, the district court decided several policy-laden issues of state law—sometimes without citing a single California case. We attempt to sort out the tangle below.

The district court's orders of June 26, 2000, and May 31, 2001, purportedly disposed of several additional claims, but the orders are—at a minimum—difficult to reconcile. The June 26 order granted summary judgment on Holly D.'s sexual assault and sexual battery claims. The May 31 order, however, remanded to the state court a sexual assault claim "included

---

**24.** We recognize that victims of sexual harassment may face considerable difficulty in reporting the wrongdoing or taking other affirmative steps to seek relief. *See* Louise F. Fitzgerald, Suzanne Swan & Karla Fischer, *Why Didn't She Just Report Him? The Psychological and Legal Implications of Women's Responses to Sexual Harassment*, 51 J. Soc. Issues 117, 121 (1995); 1 Alba Conte, Sexual Harassment in the Workplace: Law and Practice 17–21 (3d ed.2000). Indeed, in some cases, a victim's particular circumstances may render the failure to seek relief through the employer's available procedures objectively reasonable.

Here, however, the only rationale that Holly D. presents to justify her decision to forego

relief through Caltech's procedures is Caltech's alleged faculty bias. She does not contend that her depression or financial circumstances contributed to that decision. As discussed above, Holly D. has offered no facts that would support a reasonable belief that Caltech was so biased that resort to its procedures would have been futile. We therefore find that she has not presented sufficient evidence to raise a genuine issue of material fact on this issue.

**25.** In her complaint, Holly D. also alleged claims under the ADA and the Rehabilitation Act, *see supra* text accompanying note 8. She does not challenge on appeal the district court's adverse grant of summary judgment on these claims.

within" Holly D.'s FEHA sexual harassment cause of action, although the district court in the same order purportedly "dismissed" the remainder of the FEHA claim.[26] The district court offered no rationale for this odd disposition.

Both Holly D. and Wiggins find the orders confusingly inconsistent. Holly D. suggests that the first order be construed as a grant of partial summary judgment that bars only claims based on acts outside of the limitations period. By this construction, the second order then properly remands claims based on acts within the limitations period. In contrast, Wiggins maintains that judgment was granted on the claims in their entirety in the first order, and that the district court improperly "resurrected" the claims within the otherwise discharged FEHA claim on May 31. It is also possible, of course, that the district court simply reversed its own preliminary ruling: a district court has the discretion to modify intermediate dispositions at any time before final judgment is entered. *See, e.g.,* FED. R. CIV. PRO. 54(b) (explaining that an order not certified for immediate appeal that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... is subject to revision at any time before the entry of judgment ..."); *Pyramid Lake Paiute Tribe of Indians v. Hodel,* 882 F.2d 364, 369 n. 5 (9th Cir.1989) (noting that a

"trial court has discretion to reconsider its prior, non-final decisions[,] ... [especially if] justified by 'the need to correct a clear error' ").

It is difficult to review the propriety of the district court's disposition under these circumstances. The proper standard of review is uncertain.[27] The subject of our review—the basis for the district court's decision—is uncertain. Indeed, the only certainty—and here we agree with both parties—is that no discussion elsewhere in the record meaningfully explains the district court's decision.

 "It is true that, under Federal Rule of Civil Procedure 52(a), a district court need not make 'findings of fact and conclusions of law' when deciding a summary judgment motion. Rule 52(a), however, does not relieve a court of the burden of stating its reasons somewhere in the record when its 'underlying holdings would otherwise be ambiguous or inascertainable.' " *Couveau v. American Airlines,* 218 F.3d 1078, 1081 n. 3 (9th Cir.2000) (quoting *Van Bourg, Allen, Weinberg & Roger v. NLRB,* 656 F.2d 1356, 1357 (9th Cir.1981)). When the "reasons for the district court's decision are not otherwise clear from the record," *id.* at 1081, we may vacate and remand. *See id.; Shawmut Bank, N.A. v. Kress Assocs.,* 33 F.3d 1477, 1504 (9th Cir.1994); *cf. Ferland v. Conrad Credit Corp.,* 244 F.3d 1145, 1151 (9th Cir.2001)

**26.** Citing FED. R. CIV. PRO. 50(a)(1), the district court also purportedly granted a motion for a directed verdict on the FEHA claim despite the fact that no evidence had yet been presented. *See* FED. R. CIV. PRO. 50(a)(1) ("If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law...."). The procedural history is further complicated by the fact that the district court's docket sheet reflects that the district judge determined not that the motion

for a directed verdict should be granted, but that it was moot.

**27.** We would apply different standards of review depending on whether the district court intended to exercise its discretion to modify its previous order, or whether it intended to grant summary judgment on the claims after drawing particular inferences and adopting certain conclusions of law. *Cf. United States v. Dickey,* 924 F.2d 836, 839 (9th Cir.1991) (describing the different standards and remanding when it was not clear which standard applied).

(attorney fees award); *United States v. Delgado–Cardenas*, 974 F.2d 123 (9th Cir. 1992) (sentencing departures). Because the "resurrected" FEHA claims are the linchpin of the district court's ambiguous orders, because so much of the district court's resolution of the other state law claims turns on the FEHA disposition, and because the California courts are now actively examining some of the controlling issues, *see, e.g., Dep't of Health Servs. v. Sacramento County Super. Ct.*, 41 P.3d 1 (Cal.2002), we vacate the district court's judgment on the state law claims appealed to this court and remand with instructions to remand them, in turn, to state court.[28]

### III. CONCLUSION

A supervisor who fires his subordinate because she refuses to comply with his sexual demands unquestionably commits a "tangible employment action" for purposes of Title VII. We hold that a supervisor who compels a subordinate to submit to such demands by threatening to discharge her if she does not have sex with him also commits such a "tangible employment action." On this record, however, Holly D. has not established a genuine issue of material fact with respect to that portion of her complaint. In addition, although we assume that Holly D.'s allegations would support a prima facie case under the hostile environment prong of Title VII, we hold that Caltech has established as a matter of law the "reasonable care" affirmative defense that precludes employer liability with respect to such claims.

Thus, we affirm the district court's grant of summary judgment for Caltech on the Title VII claim. Because Title VII does not provide for monetary relief against a supervisor, we also affirm the district court's grant of summary judgment for Wiggins on the Title VII claim. We vacate the remainder of the tangled judgment with respect to the state claims that are the subject of this appeal, and on remand, we instruct the district court to remand these complex and policy-laden claims to the state court.[29]

**28.** Normally, on remand we allow the district court to clarify its own potentially inconsistent orders and make possible our review. Here, however, with the federal claims finally disposed of, the appropriate forum for addressing the state law claims is clearly the state court. These claims require multiple decisions on important, unsettled, and policy-laden issues of California law, including whether affirmative defenses developed under Title VII apply to California FEHA claims, whether California would modify its "continuing violations" doctrine to respond to the Supreme Court's interpretation of the limitations period of a federal statute, and whether state tort claims for infliction of emotional distress due to workplace sexual harassment are preempted by California's workers' compensation statute.

Whether a federal court should exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) is an issue "which remains open throughout the litigation," *United Mine Workers v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). When all federal claims are eliminated before trial, retaining jurisdiction only over complex questions of state law becomes, in some circumstances, especially inappropriate. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Acri v. Varian Assocs.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc); 28 U.S.C. § 1367(c). This case is now such a case. In light of its unique procedural history, and given the factors enumerated in § 1367(c) and the interests of "economy, convenience, fairness, and comity," *Acri*, 114 F.3d at 1001, retaining jurisdiction over these policy-laden claims would at this point constitute an abuse of discretion. We therefore remand to the district court with instructions to remand the remaining state law claims to the state court.

Because the state law claims preserved on appeal will be heard in the state courts, we deny as moot Wiggins's motion seeking certification of certain state law questions to the California Supreme Court.

**29.** As explained in note 10, *supra,* the claims to be remanded—along with Wiggins's coun-

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED** for further proceedings consistent with this opinion.

terclaim for defamation—are Holly D.'s FEHA and breach of contract claims against Caltech, Holly D.'s FEHA claim against Wiggins, and her claims against Wiggins for sexual assault and battery and for intentional and negligent infliction of emotional distress.